UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NICHOLAS J. STEINKE,

                Plaintiff,

        v.                                      Case No. 17-cv-653-pp

BETH DITTMANN, *et al.*,

                Defendants.

**ORDER DENYING AS MOOT DEFENDANTS' ORIGINAL MOTION FOR
LEAVE TO FILE (DKT. NO. 40), GRANTING DEFENDANTS' AMENDED
MOTION FOR LEAVE TO FILE (DKT. NO. 51), GRANTING DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 41), DENYING
PLAINTIFF'S MOTIONS TO FILE AMENDED BRIEF (DKT. NOS. 54, 61),
DENYING PLAINTIFF'S LETTER MOTIONS TO AMEND COMPLAINT (DKT.
NOS. 57, 60) AND DENYING PLAINTIFF'S MOTION TO WITHHOLD
SUMMARY JUDGMENT (DKT. NO. 62)**

        Nicholas Steinke, who is representing himself, filed a lawsuit under 42

U.S.C. §1983, alleging that the defendants violated his civil rights at the Dodge

Correctional Institution. Dkt. No. 18. Magistrate Judge David E. Jones

screened the amended complaint and allowed the plaintiff to proceed on an

Eighth Amendment claim that the defendants showed deliberate indifference to

his injuries following his seizure on November 7, 2014. Dkt. No. 20 at 3.

        On August 10, 2018, defendants Beth Dittmann, Dylon Radtke, Marc

Clements and Lisa Rost filed a motion for partial summary judgment, dkt. no.

41, along with a motion for leave to file summary judgment materials one day

late, dkt. nos. 40, 51. The defendants agree that the claims against the non-

moving defendants can proceed to trial. Dkt. No. 53 at 1. This order resolves the pending motions and dismisses Radtke, Clements, Dittmann and Rost.

## I. MOTIONS FOR LEAVE TO FILE (DKT. NOS. 40, 51)

The dispositive motion deadline was August 9, 2018. Dkt. No. 39. The defendants filed their motion for partial summary judgment on August 10, 2018. Dkt. No. 41. Counsel for the defendants explains that she was in trial earlier in the week, which resulted in her being unable to get the materials on file by August 9, 2018. Dkt. Nos. 40 at ¶5, 51 at ¶5. The plaintiff did not respond to the motion, and the court finds that the plaintiff was not prejudiced by the one-day delay. The court will deny as moot the original motion for leave to file, dkt. no. 40, and will grant the amended motion for leave to file summary judgment materials one day late, dkt. no. 51.

## II. LETTER MOTIONS TO FILE AN AMENDED BRIEF (DKT. NOS. 54, 61)

On December 5, 2017, the court issued the scheduling order. Dkt. No. 25. It attached to the order copes of Federal Rule of Civil Procedure 56 and Civil Local Rule 56. Id. at 7, 11. Rule 56(c)(1) says, among other things, that a party asserting a genuine dispute about a fact has to cite to the particular part of the record that supports that dispute. Rule 56(e)(2) warns that if a party fails to properly support an assertion of fact, or fails to address the other party's assertion of fact, the court can consider that fact undisputed for the purposes of summary judgment. Civil Local Rule 56(b)(2)(B) requires a party opposing a motion for summary judgment to file "a concise response to the moving party's

statement of facts" that must reproduce each paragraph of the moving party's proposed findings of fact and respond to each of them.

When the defendants filed their motion for summary judgment, they also attached a copy of Fed. R. Civ. P. 56 and a copy of Civil Local Rule 56. Dkt. No. 41 at 3, 8. This was the second time the plaintiff received copies of these rules. Along with their motion for summary judgment, the defendants filed sixty-one proposed findings of fact. Dkt. No. 43.

The plaintiff's response to the summary judgment is a little over one single-spaced page. Dkt. No. 52. In the first paragraph, he asks the court to "review the evidence in this case as filed with this response," asserting that the evidence is "clear cut and shows that they clearly violated my constitutional rights." Id. at 1. He asks the court to "please save taxpayers time and money as well as the courts time." Id. The plaintiff goes on to say that because only four defendants had filed for summary judgment, he "take[s] that as an admission of guilt on the other seven." Id. He disputes certain facts in the rest of the brief and refers to specific exhibits. Id. He ends by saying that "if need be and allowed I would like to submit more evidence later after this is looked over as I do have other viable evidence which I submitted earlier in the 400 plus pages of evidence I just trimmed it down as not to take up to much of the courts time please let me know if this can be done and if this was filled in a manner that pleases the courts thank you." Id. at 2. The plaintiff attached to this brief fifty-six pages of exhibits. Dkt. No. 52-1.

In their reply brief, the defendants ask the court to grant their motion for summary judgment because the plaintiff's response did not comply with Fed. R. Civ. P. 56 or Local Rule 56. Dkt. No. 53. They point out that even though the plaintiff has received the rules twice, he ignored them, filing a short brief and fifty-six pages of documents "that he expects the Court to analyze." <u>Id.</u> at 3. The defendants argue that while courts must liberally construe pleadings filed by plaintiffs representing themselves, they are not required to dig through the record to find the evidence that supports the plaintiff's position. <u>Id.</u> at 3-4.

A week later, the court received a letter from the plaintiff, addressed "To Whom It May Concern."[1] Dkt. No. 54. The letter asks "the courts" to allow him to file an amended brief, to correct the problem the defendants identified in their reply brief. <u>Id.</u> The plaintiff asserts that he was "unaware" that he had to respond to each of the defendants' proposed facts. He says that he did respond to the defendants' claims in his brief. He denies that he filed a stack of papers that he expected the court to dig through, asserting that he clearly labeled the documents and that he filed far fewer than the 400 pages of evidence that he

---

[1] This is frequently how the plaintiff files things; instead of filing a motion, with a caption and a heading that identifies the relief he's asking for, he files a letter addressed to "To Whom It May Concern." The clerk's office sometimes can figure out that the letter really is, for example, an opposition brief to the defendants' motion for summary judgment, and it will docket the filing that way. Other times, however, the clerk's office simply dockets the letter as "correspondence." The court does not necessarily know that a letter contains a formal motion asking *the court* do to something; often letters are just requests for copies, or requests for status updates, and the court does not respond to those. If the plaintiff wants *the court* to do something, he must file a motion, with a caption and a title, such as "Motion to File Amended Brief," or "Motion to Amend Complaint."

has. Id. He asked that the court either "allow [his] brief and evidence to proceed as is, or if this is not acceptable, for the courts to allow [him] to please file an amended brief in a way that pleases the courts." Id.

Partly because the court did not realize that the plaintiff was asking the court to do something, and partly because of the press of its heavy case load, the court did not respond to that request. So, a few months later, the plaintiff filed a document entitled "Motion in Support of Motion to Amend Brief." Dkt. No. 61. He says that if the court does not allow him to amend the brief, a miscarriage of justice will occur because he will not have had the chance to dispute issues and present evidence vital to his case. Id. at 1. He says he has evidence showing that he asked for evidence from the defendants, argues that he has evidence showing that "they" did not conduct a proper investigation, and contradicting some of the assertions in the defendants' brief and proposed findings of fact. Id. at 1. He also says that the defendants are "defrauding" the court by stating things as fact that the plaintiff argues are not facts. Id. at 2.

The court will deny the plaintiff's motions to amend his brief. The defendants are correct: the court sent the plaintiff copies of the rules with its scheduling order, and the defendants sent him copies with their motion for summary judgment. The rules clearly explained to the plaintiff what he needed to do; they are the same rules that the court sends to every prisoner plaintiff. Rather than following those rules, the plaintiff did exactly what the rules are designed to avoid—he filed fifty-six pages of documents and asked the court to go through them and figure out which one of them supported his version of

events, and how. That is not the court's job. The reason that the rules require the plaintiff to respond specifically to each of the defendants' sixty-one proposed findings of fact, and to identify which of his fifty-six pages of attachments supports each response, is because the court does not have the time or the ability to do that itself (and might get it wrong if it did).

The plaintiff cannot ignore the rules, and then, when the defendants point out that he ignored the rules, ask for a "do-over." In a sense, the plaintiff is asking to file a "sur-reply" to the defendants' reply brief. Neither the federal rules nor the court's local rules allow for sur-replies. The moving party files a brief, the opposing party may respond, and the moving party gets the final word through a reply brief.

The court will deny the plaintiff's motions to amend his brief. Dkt. Nos. 54, 61.

## III.    **MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 41)**

### A.    Procedural History

The plaintiff filed his complaint on May 5, 2017. Dkt. No. 1. He identified by name only one defendant—Beth Dittman, the Health Services Unit manager at Dodge. Id. at 1. The plaintiff's statement of his claim took up a single paragraph. Id. at 2-3. The plaintiff did not mention Dittman in the statement of claim; he mentioned other names, but did not include those individuals as defendants.

The plaintiff filed an amended complaint on June 23, 2017. Dkt. No. 15. He did not use the court's complaint form, so there was no caption and there

were no defendants listed at the top of the document. Id. at 1. In the amended complaint, the plaintiff mentioned by name a lieutenant, three sergeants, a doctor and a nurse. Id. at 1.

On August 11, 2017, the plaintiff filed a second amended complaint. Dkt. No. 18. Again, he did not use the court's complaint form, but he did list twelve defendants. Id. at 1. He named eight defendants—HSU manager Dittman, Sgt. Krueger, corrections officer Schmitt, Sgt. Hintz, corrections officer Lewinski, Dr. Hoftizer, nurse Burling and Lt. Arndt. Id. He listed, but did not name, the warden and security director at Dodge, a John Doe corrections officer and a John Doe HSU staff member. Id. The court screened this second amended complaint, and allowed the plaintiff to proceed on an Eighth Amendment deliberate indifference claim against all of the defendants. Dkt. No. 20.

On March 28, 2018, the plaintiff filed a list of names "to provide as the john doe," and asked the court to "amend with provided names." Dkt. No. 30. He identified the warden of Dodge as Marc Clements, and the security director as Dylon Radtke. Id. He clarified the names of some defendants he'd listed by named. Id. Finally, he stated, "on my records I requested and was provided it says RN Schedule can not be located and then listed a name of LP one is a Lisa Rost and multiple other medical staff records are being provided an refer you to exhibit (B)." Id. In an order dated July 9, 2018, the court directed the clerk's office to substitute the name of Lisa Rost for the John Doe HSU staff member the plaintiff had listed in the second amended complaint. Dkt. No. 39 at 3. The

court ordered Rost to file a responsive pleading within sixty days. Id. at 4. Rost answered on August 10, 2018. Dkt. No. 50.

On that same date, four of the defendants—Clements, Dittman, Radtke and Rost—filed this motion for partial summary judgment. Dkt. No. 41. The plaintiff responded by letter on August 22, 2018, but the clerk's office docketed the letter as his opposition brief. Dkt. No. 52. The defendants filed their reply brief on September 6, 2018. Dkt. No. 53. Since then, the court has received seven letters or requests from the plaintiff (dkt. nos. 54, 56, 57, 58, 59, 60 and 61), as well as a motion to withhold summary judgment (dkt. no. 62).

B.    Relevant Facts[2]

The plaintiff is a former Dodge inmate. Dkt. No. 43 at ¶1. The defendants are, or were, Department of Corrections employees who worked at Dodge: Marc Clements was the warden; Dylon Radtke was the security director; Scott Hoftiezer is a doctor; Lisa Rost and Thomas Burling are nurses; Beth Dittmann was the Health Service Unit ("HSU") manager; and Adam Krueger, Christopher Schmitt, Jacob Hintz, Davis Arndt and Jennifer Knox (formerly known as Jennifer Glowinski) are correctional officers. Id. at ¶¶2-5, 12, 15, 19, 32. Only four of these defendants—Clements, Radtke, Rost and Dittman—seek summary judgment.

---

[2] Unless it specifically notes otherwise, the court has taken the facts from the defendants' proposed findings of fact, dkt. no. 43, and the plaintiff's amended complaint, dkt. no. 18, which the court must construe as an affidavit at the summary judgment stage. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).

*The Events of November 7, 2014*

The amended complaint states that on November 7, 2014, the plaintiff had a seizure while in the segregation unit. Dkt. No. 18 at 2. At his deposition, the plaintiff testified that he did not remember exactly what happened, but that he believed that he fell and hit his head. Dkt. No. 43 at ¶8. The plaintiff states that when he "came to [and] got [his] bearings," he noticed blood all over himself and the floor. Dkt. No. 18 at 2; see also Dkt. No. 43 at ¶¶9-10. He hit the "emergency call button" for help, but no one responded. Dkt. No. 18 at 2.

About an hour later, Krueger conducted "rounds." Id.; see also Dkt. No. 43 at ¶12. The defendants assert that correctional officers typically conduct rounds every fifteen minutes, but at his deposition, the plaintiff testified that they were not conducting regular rounds on November 7, 2014. Dkt. No. 43 at ¶13. The complaint states that no one responded to the call button for over an hour, while his head and mouth were bleeding. Dkt. No. 18 at 2. The plaintiff says that when Krueger finally arrived, he told Krueger what had happened, and Krueger said he would call HSU. Id. At his deposition, the plaintiff "admit[ted]" that "a call from the restrictive housing unit to the HSU was logged on November 7, 2014." Dkt. No. 43 at ¶14.

"Several hours later," Schmitt made rounds. Dkt. No. 18 at 2. The plaintiff told Schmitt what happened. Id. Schmitt stated that he was aware of the plaintiff's seizure and that "HSU would be coming." Id. HSU never came that day. Id.

The next day, the plaintiff told Hintz and Lewinski about his seizure and

injuries. Id. The plaintiff states that "they also checked the log book [and] confirmed that HSU was called [and] it was logged." Id. Hintz and Lewinski "also called HSU." Id. The plaintiff still did not see anyone from HSU that day. Id.

The plaintiff says that he spoke with security director Radtke about his seizure and injuries during rounds. Id.; see also Dkt. No. 43 at ¶27. It's unclear from the amended complaint when the plaintiff interacted with Radtke— whether it was the same day as his interactions with Hintz and Lewinski or a different day. See Dkt. No. 18 at 2. As security director, Radtke made rounds on the housing units and interacted with inmates. Dkt. No. 43 at ¶¶24-26. Radtke does not recall the conversation with the plaintiff, but states that he would have contacted HSU if he had seen blood or otherwise noticed a medical emergency, and he would have told the plaintiff to "report any non-urgent medical need to security staff or complete a health services request." Id. at ¶¶28-29. Radtke appears to assert that even if he did interact with the plaintiff about the seizure incident, it would have been only once. Id. at ¶30. He also asserts that he has no record of written communications from the plaintiff. Id. at ¶31.

The plaintiff's amended complaint alleged that he also spoke to Clements during rounds. Dkt. No. 18 at 2. At his deposition, however, the plaintiff stated that he did not have any in-person contact with Clements. Dkt. No. 43 at ¶34; see also Dkt. No. 49-2 at 15, Tr. p. 54 at lines 1-3.

On November 17, 2014, about two weeks after the plaintiff's seizure,

Hoftiezer examined the plaintiff; the plaintiff "was not seen by any health care professionals" before that date. Dkt. No. 43 at ¶15; see also Dkt. No. 47-1 at 72. The examination did not reveal any trauma, and the plaintiff's head CT scan and labs were normal. Dkt. No. 43 at ¶16.

In January 2015—about two months after the alleged seizure incident— the plaintiff went to the University of Wisconsin Neurology Epilepsy Clinic for an evaluation. Id. at ¶21. The plaintiff received a neurological examination and EGG study, both of which were normal. Id. at ¶¶22-23; see also Dkt. No. 47-1 at 93 (April 16, 2015 letter from UW Health Neurology Epilepsy Center addressed to "Colleague" and copied to Dr. Hoftiezer, containing a "telemedicine progress note" indicating, among other things, that a January 7, 2015 EEG was within normal limits).

### 2.    *Inmate Complaint Number DCI-2014-23601*

The records the defendants attached to Dittman's declaration contain an interview/information request form completed by the plaintiff. Dkt. No. 47-1 at 144-45. As best the court can tell, he dated the request November 17, 2014. Id. The request states that on November 7, 2014, the plaintiff had a seizure, that he hit the emergency button but that no one responded for over an hour, that "he also informed HSU" and that HSU never responded, "despite [him] cracking the back of [his] head open & was bleeding, hurting [his] knee, having severe back & neck pain which has been chronic as well as migraines." Id. at 145.

The plaintiff wrote another interview/information request on November 20, 2014, addressed to the HSU. Dkt. No. 47-1 at 149. He indicated that he

was writing "again" about the November 7, 2014 seizure; after describing what happened, he indicated that he had never been seen "despite cracking the base of [his] head open & bleeding, hurt [his] knee, [his] back, [his] neck & having migraines as well." Id.

The plaintiff wrote another interview/information request on November 21, 2014, addressed to Dittman, which was stamped "received" on November 25, 2014. Dkt. No. 47-1 at 146. In this one, the plaintiff indicated that someone named Cpt. Billigan had told him to submit the form, and then he again describes the events of November 7, 2014. Id. He asserts that he had written "numerous requests to HSU as well as speaking with security director & didn't see doctor till 11-20-14 & he stated he knew nothing about me having a seizure at DCI so I wrote HSU again & despite writing me saying I'd be seen they stated they knew nothing about me having a seizure at DCI & I still have not been seen or treated how could this be? When will I receive medical attention?" Id.

On November 28, 2014, the plaintiff wrote an Offender Complaint. Dkt. No. 48-1 at 12. While the copy of the complaint provided by the defendants does not have a file number, the acknowledgement of receipt is dated December 3, 2014, and shows that the complaint was assigned number DCI-2014-23601. Dkt. No. 48-1 at 1. In the section for "Date of incident or denial of request," the plaintiff wrote, "11-17-14/11-7-14." Id. In the first sentence of the complaint, he wrote, "I am re-filing this complaint as I have took all proper procedures stated by ICE it will be submitted with this." Id. He then described

the incident of November 7, 2014 in more detail, as well as the physical injuries he suffered. Id. The "received" stamp is dated December 3, 2014 from the Dodge ICE office. Id.

Dittman states that a nurse named Burling saw the plaintiff on December 5, 2014, after he had self-reported having another seizure two days earlier. Dkt. No. 43 at ¶53. The records attached to Dittman's declaration contain a document showing that medical personnel saw the plaintiff on December 10, 2014; the handwriting is difficult to decipher, but under "Protocols Utilized" the notation "Seizure?" appears, and under "Education Provided," there is a notation, "call staff if he feels another episode." Dkt. No. 147-1 at 71.

On December 8, 2014, ICE examiner J. Bovee recommended that the plaintiff's November 28, 2014 inmate complaint be dismissed. Id. at 2. It indicates that Bovee contacted Dittman, who said she'd reviewed the plaintiff's medical file and found no documentation that the HSU had been notified on November 17, 2014 that the plaintiff had complained of having a seizure. Id. Bovee indicated that there were no incident reports showing that the plaintiff had suffered seizures. Id. Bovee indicated that Dr. Hoftiezer had seen the plaintiff on November 19, 2014, and that at that time, the plaintiff had reported losing consciousness in his cell "about two weeks earlier;" Dr. Hoftiezer's exam did not "reveal any trauma," and Dittman had indicated that "CT of Head and lab testing were normal." Id. Bovee reported that an EEG and "Neuro Consult (following EEG)" had been ordered. Id. Bovee also indicated that Nurse Burling

13

had seen the plaintiff on December 5, 2014 for a self-report of a seizure on December 3, 2014, but that staff hadn't witnessed the seizures. Id. Bovee said that "[f]uture testing and specialty follow-up have been ordered," and Dittmann reported that the plaintiff was receiving appropriate care. Id.

At the bottom of the plaintiff's November 17, 2014 interview request, there is a handwritten notation: "ICE on issue Responded to 12-8-14;" there is a signature after that notation. Dkt. No. 47-1 at 145. Dittman attests that she received this complaint on November 21, 2014. Dkt. No. 47 at ¶17. She indicates that she already had been contacted by the ICE office, which was why she wrote at the bottom of the request that ICE was on the issue and that the issue had been responded to on December 8, 2014. Dkt. No. 47 at ¶17.

At the bottom of the plaintiff's November 20, 2014 interview request, someone indicated that there was no documentation that HSU was called about a seizure November 7, 2014, and that the plaintiff had seen a provider since then; it advised the plaintiff to let unit staff know if he had any seizures in the future. Id.

At the bottom of the plaintiff's November 21, 2014 interview request, the following handwritten notation appears: "ICE on issue responded to on 12/8/14." Dkt. No. 47-1 at 147. Dittman attests that she received this complaint on November 25, 2014, and that she already had been contacted by the ICE office, which was why she wrote that ICE was on the issue and that the request had been responded to on December 8, 2014. Dkt. No. 47 at ¶18.

On February 10, 2015, the plaintiff wrote an interview/information

14

request to Dittman; the "received" stamp is dated February 11, 2015 by "Primary Care." Dkt. No. 47-1 at 131-132. This request indicated that the plaintiff had suffered a seizure on January 27, 2015. Id. This request indicated that the plaintiff had hit the emergency call button in his cell, that two hours passed and that no one had come. Id. The plaintiff said that different officers passed on three different occasion and he yelled out that he was having a medical emergency and that the back of his head was bleeding, but that the officers completely ignored him. Id.

Dittman attests that she received this request on February 11. Dkt. No. 47 at ¶19. She indicates that she reviewed the plaintiff's medical chart, which indicated that health staff had seen the plaintiff on January 27, 2015 at 8:25 p.m. and on January 28, 2015 at 12:15 p.m. Id. Accordingly, Dittman responded to the plaintiff by writing at the bottom of the request, "Noted—no response Pt seen on 1/27/15 @ 2025 & 1/28/2015 @ 1215." Id.

Dittmann notes that she did not personally provide the plaintiff with any medical care and did not have any in-person communication with him. Dkt. No. 43 at ¶¶39-40, 54.

3. *Unrelated Inmate Requests*

Defendant Clements provided a declaration in support of the motion for summary judgment. Dkt. No. 46. He attached to that declaration three interview/information requests from the plaintiff. Dkt. No. 46-1.

The plaintiff wrote an interview/information request form which was stamped received on November 26, 2014 by the warden's office at Dodge. Dkt.

No. 46-1 at 1. In it, the plaintiff stated,

> I have wrote numerous times to the ICE Examiner about (2) ICE's I have pending at MSDF & have been waiting for a response to. I have got no response what-so-ever. They where acknowledged on 9-5-15 10-1-14 10-24-14 I came to DCI 10-31-14. I would like to know why I have got no response & they've had these ICE's for a substantial amount of time & they are of importance to me. They are complaint #MSDF 2014-21022 MSDF 2014-19658, MSDF 2014-18149.

Id. Someone wrote at the bottom of the document that the request was "answered by ICE J. Bovee on 11-27-14," and it is signed by "R. Hopp" of the warden's office. Dkt. No. 46-1 at 1.

The next interview/information request was stamped received by the warden's office at Dodge on December 17, 2014. Id. at 3. In this one, the plaintiff indicates that he wrote an inmate complaint on December 10, 2014 and "sent it in the envelope," but that he did not get a response. Id. He indicates that he resubmitted that complaint and "still didn't get a response." Id. He indicates that he has carbon copies of both complaints, and demands to know why his inmate complaints were being ignored "as this is very important as it pertains to Failure For Medical Treatment." Id. At the bottom of this complaint, someone has written, "Your ICE's have been acknowledged and answered within the time limits. Please be patient." Id. It is signed by "A. Hopp." Id.

The final interview/information request is stamped received by the warden's office at Dodge on December 30, 2014. Id. at 4. In this one, the plaintiff says that he as "(3) unresolved ICE's at MSDF that they had for 5 month wich more than exceeds the time limit." Id. at 4. He says that he would

16

like to know "why & have this issue addressed." Id. At the bottom of the form, someone wrote, "You have 16 complaints accepted from MSDF in 2014. Could you be more specific as to the complaints you have questions on. Please send those questions to the DCI ICE." It is signed by "M. Patten," of the ICE department. Id.

In his declaration, Clements explains that while he did not recall receiving correspondence from the plaintiff, he found the three interview/ information request forms described above when he reviewed his records. Dkt. No. 46 at ¶10. He indicates that all three of these requests "related to pending complaints he had submitted through the Inmate Complaint Review System at the Milwaukee Secure Detention Facility and Dodge." Id. at ¶11. Clements attests that as warden, he delegated to his secretary, complaint examiners or other staff members the task of answering "correspondence regarding inmate complaints" addressed to him. Dkt. No. 46 at ¶12. He indicates that the "R. Hopp" who signed the response was his secretary, Rachelle Hopp, and that her response that ICE had addressed the complaint was appropriate. Id. at ¶13. He also says that ICE Patten appropriately responded to the request received on December 30, 2014. Id. at ¶14.

### 4. *Defendant Rost*

Rost was working as a nurse at Dodge at the time of the events the plaintiff described in the second amended complaint. Dkt. No. 43 at ¶42. Her responsibilities included completing medication sheets and delivering medication. Id. at ¶43. She did not conduct rounds within the units, triage

inmates in HSU, respond to emergencies, answer calls, handle scheduling, or otherwise provide medical care to inmates. Id. at ¶¶44-45. The only time the plaintiff could have interacted with Rost is within HSU, if he received medication from her. Id. at ¶46.

C.    Discussion

1.    *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### 2.  *Section 1983's Personal Involvement Requirement*

Clements, Radtke, Dittmann and Rost ask the court to grant summary judgment in their favor because they were not personally involved in the plaintiff's medical care. "Section 1983 creates a cause of action against any person who, under color of state law, 'subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" Johansen v. Curran, No. 15 C 2376, 2016 WL 2644863, at *2 (N.D. Ill. May 10, 2016) (internal citations omitted). "To succeed on an individual capacity claim under 42 U.S.C. § 1983, [the plaintiff] must show that the defendants, while acting under the color of state law, personally caused or participated in the alleged constitutional deprivation." Id.

"An official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent." Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995) (quoting Crowder v. Lash, 687 F.2d 996, 1005 (7th Cir. 1982)). He or she "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. (quoting Jones v. City of Chi., 856 F.2d 985, 992 (7th Cir. 1988)).

a. Clements

Clements attests that he does not recall "ever being contacted by any staff member about [the plaintiff's] alleged seizure in November 2014, or the 'cracked skull' and other injuries he claims resulted during the seizure." Dkt. No. 46 at ¶16. He also attests that he did not have any knowledge that the palitniff ever wrote to him regarding the alleged November 7, 2014 seizure or the allegation that he got no medical treatment for it. Id. at ¶17. Finally, Clements says that if the plaintiff had told him that he was having issues with health care, Clements would have forwarded that information to the HSU. Id. at ¶18.

The record before the court supports Clements' claim that he had no personal involvement in the events the plaintiff has described in the amended complaint. Although the plaintiff alleged in the amended complaint that he told Clements about his seizures/injuries during rounds, the plaintiff later admitted at his deposition that he did not have any in-person contact with Clements. In fact, at his deposition, the plaintiff said that Clements "never made a single round." Dkt. No. 49-2 at 13, Tr. p. 49 at line 13. While Clements's office received three interview/information requests from the plaintiff in November and December 2014, two of those related to inmate complaints the plaintiff had filed *prior* to arriving at Dodge, and *prior* to the date of the alleged seizure. The third interview/information request made reference to an inmate complaint filed December 10, 2014 and re-submitted December 15, 2014; the complaint the plaintiff filed about the November 7, 2014 seizure was dated November 28,

2014. All three of the requests that made their way to Clements's office, therefore, related to other issues, and not to the plaintiff's claims about a November 7, 2014 seizure.

When asked at his deposition for the basis of his claim against Clements, the plaintiff responded,

> The fact that I filed every single thing that they asked me to, wrote everything. And he's in charge of all that. I asked him to oversee; went through their process, the ICE, everything, and nothing was done. I just sat in the cell left to die.

Dkt. No. 49-1 at 13, Tr. p. 49 lines 2-7. The plaintiff appears to allege that because Clements was the warden, he is liable for any alleged constitutional violations committed by anyone at Dodge. The law says otherwise. A supervisor cannot be held liable for "conduct of a subordinate that violates a plaintiff's constitutional rights" unless the plaintiff shows that the supervisor knew about the conduct and approved the conduct and the basis for it. Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th Cir. 2001) (citations omitted). There is no evidence that Clements knew about the alleged actions of Dodge staff relating to the plaintiff's alleged seizure, or that he approved it. The court will dismiss Clements.

### b.    Rost

Nurse Rost attests that she did not have any knowledge of the plaintiff's medical conditions. Dkt. No. 45 at ¶6. In his second amended complaint, the plaintiff stated that the John Doe HSU staff member he was suing was "whoever received the call that was logged to HSU on 11-7-14." Dkt. No. 18 at 2. It is not clear what "call" the plaintiff is referring to, but the court thinks he

is referring to his allegation that Sgt. Krueger told the plaintiff that "he'd get HSU." Id. Rost does not answer calls or respond to emergencies; she fills out medication sheets and delivers medications.

The only reason Rost is named as a defendant is that when the defendants provided him with discovery to help him identify the Doe defendants, the only nurse listed was Rost. There is no evidence that Rost was personally involved in the events surrounding the plaintiff's alleged seizure. The court will dismiss Rost.

c.    Radtke

As best the court can tell from the amended complaint, the plaintiff alleges that the day *after* the seizure—November 8, 2014—he spoke with Radtke when Radtke made his rounds in segregation and told him about his situation and his injuries, but that nothing happened. Dkt. No. 18 at 2. At his deposition, the plaintiff testified that he named Radtke in the complaint "[b]ecause he also was another person that had come by." Dkt. No. 49-2 at 10, Tr. p. 36 at line 3. The plaintiff testified that Radtke "did a round," and that when Radtke "came around and spoke with [the plaintiff], [the plaintiff] knew he was the security director, so [the plaintiff] knew he was somebody had run of the institution and could get something done." Id. at lines 4-10. Radtke acknowledges that he frequently made rounds in his role as security director. Dkt. No. 44 at ¶7. He does not recall having a conversation with the plaintiff about the plaintiff having had a seizure, or seeing injuries or blood. Dkt. No. 44 at ¶8.

Even assuming the plaintiff spoke with Radtke the day after the alleged seizure, told Radtke what had happened and Radtke did nothing, the Seventh Circuit has held that "inaction following receipt of a complaint about someone else's conduct is not a source of liability." Estate of Miller by Chassie v. Marberry, 847 F. 3d 425, 428 (7th Cir. 2017); see also Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("[The plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor . . . and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right.").

The plaintiff's allegations do not raise a genuine issue of material fact as to whether Radtke was personally involved in the events relating to the alleged seizure. The court will dismiss Radtke.

d.    Dittmann

In the amended complaint, the plaintiff alleged that he'd received an ICE response indicating that HSU director Dittmann "denied ever knowing about the incident despite HSU being called after Emergency call button & despite [the plaintiff] writing multiple HSU requests." Dkt. No. 18 at 3. During his deposition, the plaintiff said this about why he named Dittmann as a defendant:

> Because she's the one that's at most fault of all of them. She's the one that's the head of HSU. Before I could submit my ICE, I was

directed by the ICE director to write to Beth Dittmann, which I did, informing her of the situation and interview request, which is submitted into evidence as well stating what happened, stating my injuries, stating that I hadn't been seen, and that I would like to be seen for it, and all that and everything else. And yet she still did nothing. I wrote multiple HSU requests, still nothing was done.

Dkt. No. 49-2 at 9, Tr. p. 32 at lines 12-22.

The evidence indicates that Dittmann had no personal interactions with the plaintiff and did not provide the plaintiff with any medical care. Dittmann appears to have become aware of the plaintiff's allegations on November 21, 2014, when she received his November 17, 2014 interview/information request. That was two weeks *after* the events the plaintiff described in the amended complaint, and a couple of days after the plaintiff had reported the episode to Dr. Hoftiezer.

Again, the plaintiff appears to allege that because Dittmann was the HSU director, she is responsible for any alleged constitutional violations by anyone in HSU. He assumes that she had to have known about the events of November 7, 2014 because they involved a medical incident, and she was the director of the HSU. This is not sufficient to state liability under §1983. There is no evidence that Dittmann knew about what was happening at the time it was happening—November 7-8, 2014. She cannot be held liable solely because she was the HSU supervisor, any more than Clements is liable because he was the warden.

The court will dismiss Dittmann as a defendant.

## IV. THE PLAINTIFF'S MOTION TO WITHHOLD SUMMARY JUDGMENT (DKT. NO. 62)

On February 28, 2019, the court received a motion from the plaintiff, asking it to hold off on ruling on the summary judgment motion until he could "obtain all vital discovery that [he] is waiting for as well as to allow [him] to amend [his] complaints to list all proper defendants & damages that [he seeks] that [he] can properly apply & assess upon receiving the discovery [he awaits]." Dkt. No. 62. In his supporting affidavit, the plaintiff says that during the discovery process, counsel for the defendants told him that "for any discovery [he] may contact Dodge Correctional Institution." Dkt. No. 63. He says that he did that, and paid for copies of discovery out-of-pocket. Id. He indicates that as he was preparing for summary judgment, he noticed "pieces of missing discovery." Id. He says he wrote to Dodge on February 6, 2019, asking for discovery; he received a response from ICE Patten on February 19, 2019 telling him to contact counsel for the defendants. Id. He says that he wrote to counsel for the defendants on February 20 and February 25, 2019, asking for discovery. Id. He says he needs the discovery to "prepare & present for summary judgment" and to "amend [his] complaint to list all proper defendants & damages." Id.

In its December 5, 2017 scheduling order, the court set a deadline of March 20, 2018 for the parties to complete discovery. Dkt. No. 25. The plaintiff asked the court to extend that deadline, dkt. no. 26, as did the defendants, dkt. no. 27; the court granted those requests, and extended the discovery deadline to May 31, 2018, dkt. no. 29. The defendants then asked for another

extension. Dkt. No. 35. The court granted that request, and extended the deadline to June 15, 2018. Dkt. No. 36. The parties had over six months to exchange discovery. If the plaintiff had difficulty getting the documents he needed, he should have filed a motion for an extension of the June 15, 2018 deadline; if the defendants were not responding to his discovery requests, he should have filed a motion to compel the defendants to comply with his requests. The court will not reopen discovery nine months after it has closed to allow the plaintiff to request information that he already has had six months to request.

The plaintiff says that he needs the discovery to prepare for summary judgment. The deadline for parties to file summary judgment motions was July 6, 2018. Dkt. No. 29. It is too late for the plaintiff to file a summary judgment motion.

The plaintiff also says that he needs the discovery to enable him to amend his complaints. The court first notes that there is only one "complaint"—the second amended complaint that the plaintiff filed on August 11, 2017. An amended complaint "supersedes," or replaces, any earlier complaints, so the plaintiff's August 11, 2017 second amended complaint replaced the earlier two complaints. Second, because the defendants have answered the second amended complaint (and filed for summary judgment), the plaintiff must ask the court for permission to amend the complaint. Fed. R. Civ. P. 15(a)(2). The plaintiff has filed some letters asking to amend his complaint to change the amount of damages he has requested, from

$1,000,000 to $10,000,000. Dkt. Nos. 57, 60. The court will deny those requests; they come too late, and the plaintiff has not stated a good reason for increasing his requested damages, other than saying he has information now that he did not have when he filed the amended complaint. He does not explain what that information is. The plaintiff has not asked the court to allow him to amend for any other reason, and even if he had, the court would not allow him to add defendants or claims at this very late stage in the case.

## V.     CONCLUSION

The court **DENIES** as moot the defendants' original motion for leave to file summary judgment materials one day late. Dkt. No. 40.

The court **GRANTS** the defendants' amended motion for leave to file summary judgment materials one day late. Dkt. No. 51.

The court **DENIES** the plaintiff's motions to amend his summary judgment opposition brief. Dkt. Nos. 54, 61.

The court **GRANTS** the defendants' partial motion for summary judgment. Dkt. No. 41.

The court **ORDERS** that defendants Dittmann, Radtke, Clements, and Rost are **DISMISSED**.

The court **DENIES** the plaintiff's letter motions to amend the amount of damages he seeks. Dkt. Nos. 57, 60.

The court **DENIES** the plaintiff's motion to withhold summary judgment. Dkt. No. 62.

Because the remaining defendants are in a trial posture, the court will recruit a volunteer lawyer to represent the plaintiff. Once the court has found someone, it will send the plaintiff a form to fill out, accepting the representation. If the plaintiff wishes to proceed with the recruited lawyer, he should sign the form and mail it to the court. Once the court receives that form back from the plaintiff, it will set up a status conference to discuss next steps.

Dated in Milwaukee, Wisconsin this 19th day of March, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**