UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NICHOLAS STEINKE,
    Plaintiff,

  v.                Case Nos. 17-cv-0653-bhl
                     17-cv-0656-bhl

GERALD KRUEGER, et al.,
    Defendants.

---

# DECISION AND ORDER

---

On May 5, 2017, plaintiff Nicholas Steinke filed two lawsuits in the Eastern District of Wisconsin alleging that various defendants were deliberately indifferent towards his seizure disorder. *Steinke v. Dittmann*, Case No. 17-cv-0653-bhl; *Steinke v. Krueger*, Case No. 17-cv-0656-bhl. On May 6, 2020, the Court granted Steinke's unopposed motion to consolidate these cases. On October 7, 2020, the defendants in Case No. 17-cv-0656-bhl filed a motion for summary judgment. Dkt. No. 113. Steinke later stipulated to dismiss his claims against two of the defendants from that case, nurses Renee Schueler and Thomas Burling. Dkt. No. 125. Through this order, the Court approves the parties' stipulation and dismisses Schueler and Burling from the case. The Court also grants the remaining defendants' motion for summary judgment and dismisses Case No. 17-cv-656-bhl in its entirety.

## FACTUAL BACKGROUND

At the relevant time, Steinke was an inmate at DCI. Dkt. No. 115, ¶1. Defendants Gerald Krueger, Ricky Breselow, Brenda Chapman, Alyssa (Kiesow) Maltby, and Linden Hannon were correctional officers at DCI. *Id.*, ¶¶2-6.

### a. Steinke's Intake Screening at DCI

Steinke arrived at DCI on June 21, 2016. Dkt. No. 115, ¶45. That day, nurse Carmen Zacharias (not a defendant) reviewed Steinke's "Health Transfer Summary," a document completed by Steinke's prior institution to communicate information about his health. *Id.*, ¶¶18-21. Steinke's Health Transfer Summary did not mention any health issues or concerns; he was not taking any medication at the time nor were there any other "restrictions" or "orders" in place regarding his health. *Id.*, ¶¶20-21, 27. Zacharias then completed an "Intake Screening/Medical History" form. *Id.*, ¶22. Zacharias noted on the form that Steinke self-reported a seizure disorder. *Id.* Steinke indicated that he last took anti-seizure medication about a year prior to his intake and that his last seizure was about the same time. *Id.*, ¶23. Zacharias further noted that Steinke should return to the Health Services Unit (HSU) for a physical examination by an advanced care provider, but she did not issue any other written "orders" or "restrictions" at the time. *Id.*, ¶¶25-27.

Zacharias admits she cannot remember if Steinke specifically asked for a "low bunk" restriction during the intake screening process. *Id.*, ¶24. But she explains that an inmate usually has to be on an anti-seizure medication to get a low bunk restriction. *Id.* Zacharias states that many inmates self-report having a seizure disorder during the intake process, and she usually does not place an inmate on a low bunk restriction solely for preventative measures. *Id.*, ¶¶29-30. If an inmate has reported *frequent* seizures, she will put the inmate's name on the list for an early physical by an advanced care provider. *Id.*, ¶30. Steinke did not report frequent seizures, so Zacharias did not place him on the list for an early physical examination. *Id.* While on the intake unit, Steinke received a low bunk (even though he did not have a written "order" or "restriction" for a low bunk.) *Id.*, ¶45. He had no issues with his medical condition at that time. *Id.*

### b. The June 27, 2016 Incident on Unit 24

About a week later, on June 27, 2016, Steinke was transferred out of the intake unit to his permanent cell in Unit 24. Dkt. No. 115, ¶46. There, he was assigned a "top bunk." *Id*. Upon arriving on the unit at around 9:00 a.m., Steinke told Krueger, Chapman, and Breselow (all of whom were first-shift officers that day) that he had a seizure disorder and needed a low bunk. Dkt. No. 122, ¶¶5-7, 12, 14; *see also* Dkt. No. 115, ¶56. Steinke asserts that the officers did not contact medical staff or the on-duty sergeant about his request. Dkt. No. 122, ¶¶9-10, 15-16.

Krueger reports that he looked up Steinke's medical information on the Wisconsin Integrated Corrections System (WICS). Dkt. No. 115, ¶59. WICS contains a profile about each inmate, including information about their criminal history, criminal sentence, housing location, assessments, special medical needs/restrictions, and other information. *Id*., ¶42. When an inmate is given a medical restriction, it is placed in the WICS database, so that security staff can quickly obtain the information as necessary without asking HSU staff. *Id*., ¶¶8, 43. The WICS did not show a medical restriction for a low bunk, so Krueger told Steinke to put in an HSU slip making the request for a low bunk. *Id*., ¶¶54, 59.

Krueger explains that health-care related housing decisions are made by medical staff, not correctional staff. *Id*., ¶7. If an inmate asks correctional staff for a low bunk restriction based on a medical need, correctional staff will direct the inmate to fill out an HSU slip so the inmate can be seen by a medical professional for the purpose of determining whether that restriction is medically necessary. *Id*., ¶13. Certain correctional officers, such as the "on-duty sergeant," have authority to change bunk assignments for security reasons, i.e., "if two inmates are close to fighting." Dkt. No. 129, ¶ 29. But they do not have authority to make medical related decisions, especially when medical staff is available on shift. *Id*., ¶24.

3

Chapman states that she was a "floater" on the unit on June 26, 2016 and overheard the conversation between Steinke and Krueger regarding the request for a low bunk. Dkt. No. 115, ¶¶66-67. Chapman told Steinke to put his mattress on the floor until they could get everything "figured out." *Id*., ¶68. Breslow states that he does not know or recall Steinke. *Id*., ¶65. He appears to have no other information about the incident.

Despite Chapman's instruction to put the mattress on the floor until they could get things "figured out," Steinke apparently climbed up to his top bunk sometime after lunch. *Id*., ¶¶57, 61, 71. He later fell "approximately 3-4 feet," allegedly after suffering a seizure. *Id*. After a 12:15 p.m. cell count, Steinke's cellmate called for Krueger. *Id*., ¶62. Krueger saw Steinke on the floor and immediately called the unit sergeant for assistance. *Id*. Medical staff arrived shortly thereafter and took Steinke to the Emergency Room (ER). *Id*., ¶¶63, 71.

### c. Treatment at the ER

At the ER, Steinke rated his pain as 6/10 and denied loss of consciousness. Dkt. No. 115, ¶72. According to Steinke's medical records from the ER, he did not appear to be in acute distress, and he was alert and oriented. *Id*. His head showed no evidence of trauma, his vision was normal, and his lumbar spine was tender but there was no swelling, no laceration, or discoloration. *Id*. Steinke received a CT scan of his pelvis, cervical spine, lumbar spine, thoracic spine and head. *Id*., ¶73. The findings were all negative for significant injury. *Id*. Steinke was ultimately diagnosed with a back contusion (a bruise), which was described as "swelling and some bleeding under the skin." *Id*., ¶76. By the time Steinke was discharged from the ER about three hours later, he said he felt "much better now" and only had mild tenderness of his neck and lower back. *Id*., ¶75. There is no reference to wheelchair, inability to ambulate, movement limitations, or a neck collar in any of his medical records. *Id*., ¶74.

### d. Steinke's Return to DCI

Steinke states that, upon returning to the institution, he told Maltby and Hannon (both of whom were second-shift officers that day) that he needed a first-floor cell because he could not walk or move without experiencing severe pain. Dkt. No. 122, ¶¶17, 22, 28, 31. It is unclear what happened after he made the request; Steinke's response materials provide no other information regarding this claim. *See* Dkt. 122. According to Steinke's third amended complaint, his request "was denied" and he was forced to walk to the top tier, which caused him pain. Dkt. No. 65 at 5. Maltby and Hannon both state that they do not remember Steinke or the incident that occurred on June 27, 2016. Dkt. No. 115, ¶77. At around 3:13 p.m. that day, Steinke received a low bunk restriction for two months and he was assigned to a low bunk in a different cell in the same unit. *Id.*, ¶¶38, 47. The restriction was extended for an additional month until Steinke's self-reported seizure disorder could be assessed by outside medical care providers. *Id.*, ¶39.

There is no record in WICS, or Steinke's other medical records, of Steinke ever having a wheelchair restriction, a neck collar, or a first-floor restriction/elevator pass. *Id.*, ¶¶16, 48, 79. Inmates are limited in what items they can have in their cells for security reasons, so a restriction for a wheelchair or a neck collar would be noted in WICS and their medical records. *Id.*, ¶¶48, 80. Steinke may have been transported from the ER in a wheelchair based on hospital policy, but there is no record of a medical order for a wheelchair or a neck collar. *Id.*, ¶¶80-81.

### e. Diagnosis from the UW Epilepsy Clinic and UW Neurology

Steinke underwent a variety of tests and examinations to assess his self-reported seizure disorder. Dkt. No. 115, ¶¶51, 88-92. He had a physical examination with Dr. Hoftiezer, two CT scans, an EEG, and an MRI. *Id.* The tests came back "negative" or "normal;" and there were no objective medical findings to support a seizure diagnosis. *Id.* UW Neurology ultimately

5

concluded that Steinke probably had "generalized epilepsy" that could be controlled with medication. *Id*., ¶¶97, 100. Nurse Practitioner Nancy Garcia (not a defendant) then ordered the medication that was recommended by UW Neurology to control his condition. *Id*., ¶¶83, 95. Steinke ultimately refused to take the medication saying, "I am being told I am not diagnosed with seizures and therefore I was priorly put on improper medication." *Id*., ¶95.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party asserting that a fact is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

The defendants assert they are entitled to summary judgment because the undisputed evidence shows Steinke did not have a low bunk restriction, a wheelchair restriction, or a first-

6

floor restriction/elevator pass on June 27, 2016. Dkt. No. 114 at 21. They claim that they were entitled to reject Steinke's self-reported seizure disorder and rely on medical information in WICS, which did not show any ordered medical restrictions or accommodations. *Id*. at 22-26. They also note that many of Steinke's allegations are not supported by the record.

To survive summary judgment on an Eighth Amendment deliberate indifference claim, Steinke must provide evidence from which a reasonable jury could conclude that the defendants: (1) knew of an objectively serious medical condition; and (2) were deliberately indifferent towards that medical condition by "not taking minimally competent steps to deal with that condition." *Est. of Miller by Chassie v. Marberry*, 847 F.3d 425, 427–28 (7th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994); *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016)).

Steinke's claims fall squarely within the bounds of a four-year old Seventh Circuit case involving a prisoner who fell from an upper bunk after being denied a requested lower bunk. *See Estate of Miller v. Marberry*, 847 F.3d 425, 427–28 (7th Cir. 2017). In that case, the plaintiff alleged that a correctional officer was deliberately indifferent toward his serious medical condition when the corrections officer did "nothing" despite being told the prisoner needed a low bunk restriction due to a brain tumor. *Id*. The plaintiff later fell out of his upper bunk twice and, after the second fall, broke his back. *Id*. Even though the plaintiff had been previously diagnosed with a brain tumor, and his medical records included a low bunk restriction, the Seventh Circuit affirmed the grant of summary judgment on the prisoner's deliberate indifference claims because the prison guard defendant did not have access to the institution's computer database to verify the plaintiff's assertions regarding his medical needs. *Id*. at 428. The Seventh Circuit noted, "[p]risoners can be manipulative, using deceit to obtain advantages; guards are accordingly entitled

7

to be skeptical." *Id*. It concluded that the defendant was not "obliged to believe [the plaintiff's] assertion that he had a brain tumor and a lower-bunk pass." *Id*. The Seventh Circuit also explained that, where an inmate sues correctional staff for deliberate indifference towards a medical condition, guards and wardens are entitled to rely on the medical staff to make medical decisions about medical problems. *Id*. at 427.

This case involves allegations that are much less severe than those the Seventh Circuit concluded supported summary judgment in *Marberry*. It is undisputed that Steinke did not have a medical restriction from medical staff for any of the medical accommodations he requested, and the record shows that correctional staff were not authorized to order medical restrictions or medical accommodations. Under *Marberry*, the defendants, therefore, could not have been deliberately indifferent in refusing to provide medical restrictions and accommodations they were not authorized to provide.

Steinke insists that certain correctional officers, such as the on-duty sergeant, were authorized to change bed assignments, unit assignments, or floor assignments. Dkt. No. 124 at 14-15. He thus argues that, if any of the correctional officers had called Breslow or Hannon, they may have been able to order the accommodations he requested. *Id*. But this argument ignores that correctional staff have limited authority to make housing accommodations for security-related reasons, such as inmate fighting; they are neither qualified nor authorized to make accommodations for medical purposes. Steinke's purported need for a medical accommodation was an issue the correctional staff properly declined to adopt given the information they accessed in WICS.

Steinke claims that Nurse Zacharias told him that he would be assigned to a low bunk because of his purported medical condition and argues that he would not have received a low bunk

on the intake unit unless she requested it. *Id*. But, even assuming Nurse Zacharias made a verbal request that Steinke be assigned to a low bunk in the intake unit, it is undisputed that Nurse Zacharias did not enter a written "order" or "restriction" in WICS sufficient to alert correctional staff of this alleged medical accommodation. Thus, like the defendant in *Marberry,* the defendants in this case would have been unaware of the "details, consequences, and appropriate accommodations" that Steinke purportedly needed in general population, assuming he had such a medical need. 847 F.3d at 428. Absent knowledge of such an actual medical directive, the defendants were not deliberately indifferent.

Steinke states that, if any of the correctional officers had "called" HSU using the telephone on the unit, they might have spoken to Nurse Zacharias, who might have confirmed what he said. Dkt. No. 124 at 3. But correctional staff had no reason to undertake such efforts and, even if they had, the results that Steinke posits are purely speculative. As the Seventh Circuit explained in *Marberry,* prisons divide labor, and correctional staff are not responsible for ensuring that other individuals at the institution do their jobs correctly. The defendants were entitled to rely on medical information entered in the WICS database, which undisputedly did not show any required lower bunk accommodation. Steinke's entire case boils down to his belief that best practice would have been for security staff to "call" HSU (rather than checking the computer database created for the very purpose of quickly communicating information). But Steinke's preference for an alternate practice does not establish deliberate indifference.

Finally, Steinke also claims that Maltby was deliberately indifferent by making him walk up the stairs in pain and that she "does not dispute" that he was in a wheelchair and neck collar upon returning from the ER. Dkt. No. 124 at 3, 15-16. But Steinke mischaracterizes the record; Maltby simply does not remember what happened that day. She does not accede to Steinke's

9

version of events. *See* Dkt. No. 129, ¶27. In any case, as discussed above, the undisputed evidence shows that Steinke did not have a medical restriction for a wheelchair or an elevator pass at the time he returned from the ER. As a member of the correctional staff, Maltby did not have authority to issue a medical accommodation herself and thus she could not have been deliberately indifferent for refusing such an accommodation. Regardless of whether Maltby remembered what happened that day, she had no authority to issue him a medical accommodation and could not have violated Steinke's constitutional rights by making him walk up a flight of stairs. The defendants are entitled to summary judgment.

## CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Renee Schueler and Thomas Burling are **DISMISSED** from Case No. 17-cv-656-bhl; the remaining defendants' motion for summary judgment (Dkt. No. 113) is **GRANTED;** and Case No. 17-cv-656-bhl is **DISMISSED**. The clerk's office is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of May, 2021.

s/ *Brett H. Ludwig*
Brett H. Ludwig
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.